**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE LORDSTOWN MOTORS     )
CORP.                     )      C.A. No. 2023-0083-LWW

**OPINION**

Date Submitted: February 20, 2023
Date Decided: February 21, 2023

Raymond J. DiCamillo, Kevin M. Gallagher, Alexander M. Krischik, Edmond S. Kim & Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Petitioner Lordstown Motors Corp.*

**WILL, Vice Chancellor**

This decision addresses a company's petition under 8 *Del. C.* § 205 to validate and declare effective an amendment to its certificate of incorporation and stock issued in reliance on that amendment. The petitioner is not alone in seeking this relief. Dozens of companies—all formed as special purpose acquisition companies (SPACs)—have filed similar petitions.

In connection with de-SPAC mergers, these companies proposed amendments to their certificates of incorporation to increase the number of authorized Class A common shares. Believing Class A shares to be of a series of common stock, the companies did not hold a separate Class A vote on the proposed amendments. Rather, the charter amendments were approved by a majority of the common shares entitled to vote, voting as a single class. Subsequently, the amendments were effectuated and billions of shares were issued with the understanding that they were authorized by the companies' certificates of incorporation.

That perception was shaken in December 2022 when the Court of Chancery issued a decision in *Garfield v. Boxed, Inc.*[1] There, the court considered a fee petition filed after a SPAC—in response to a stockholder demand—held a separate Class A vote on a proposed charter amendment to increase the number of authorized Class A common shares. In considering whether the demand was meritorious when

---

[1] 2022 WL 17959766 (Del. Ch. Dec. 27, 2022).

made, the court determined that the company's Class A shares were a separate class of stock based upon the plain text of the company's certificate of incorporation. The separate class vote undertaken by the company because of the demand "defuse[d] a ticking time bomb," warranting a fee award for the stockholder's counsel.[2]

Many post-de-SPAC companies, met with sudden doubts about the soundness of their capital structures, were left to "clean[] up the shrapnel"[3]—years after the relevant stockholder votes. These companies could no longer determine which shares of their widely-traded stock were valid, threatening to undermine their financial positions and create market disruption. Equity financings critical to the companies' ongoing operations have been put in jeopardy. Certain companies now face difficulties in filing Form 10-Ks and the possibility of stock exchange delisting.

A flood of Section 205 petitions followed, each seeking to validate similar corporate acts with varying degrees of potential flaws. If separate Class A votes on the share increase charter amendments were required under 8 *Del. C.* § 242(b), many amendments did not obtain sufficient support. Some companies potentially overissued hundreds of millions of shares beyond that authorized by the prior iterations of their certificates of incorporation. Others, though obtaining the requisite number of votes, disclosed the wrong voting standard. Regardless of

---

[2] *Id.* at *11.

[3] *Id.*

whether these matters render the corporate acts at issue defective as a technical matter, the companies are experiencing the same pervasive uncertainty and risk of harm.

Fortunately, the Delaware General Assembly had the foresight to provide an equitable solution for such seemingly incurable problems. Section 205 grants this court the authority to declare corporate acts and putative stock to be valid. In assessing a request for validation, the court may consider any factors it deems just and equitable.

In the instant case, validation is appropriate for numerous reasons. The company had a good faith belief in the validity of its charter amendment. It, along with third parties, acted in reliance on that belief for years. Ratification will restore confidence in the company's capital stock and assuage market fears. A contrary ruling would invite untold chaos.

## I.    FACTUAL BACKGROUND

The background is drawn from the petitioner's Verified Petition for Relief Pursuant to 8 *Del. C.* § 205 (the "Petition"), the documents incorporated by reference, and documents subject to judicial notice.[4]

---

[4] Verified Pet. for Relief Pursuant to 8 *Del. C.* § 205 (Dkt. 1) ("Pet."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch.

## A. The 2019 Charter

Petitioner Lordstown Motors Corporation ("Lordstown" or the "Company") was incorporated in Delaware on November 13, 2018 as a special purpose acquisition company.[5] The Company amended and restated its initial certificate of incorporation on February 27, 2019 (the "2019 Charter").[6] The 2019 Charter authorized the Company to issue:

> 111,000,000 shares, consisting of (a) 110,000,000 shares of common stock (the "Common Stock"), including (i) 100,000,000 shares of Class A Common Stock (the "Class A Common Stock"), and (ii) 10,000,000 shares of Class B Common Stock (the "Class B Common Stock"), and (b) 1,000,000 shares of preferred stock (the "Preferred Stock").[7]

The Company's Class A Common stock traded (and continues to trade) on the NASDAQ.[8]

---

2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").

[5] Pet. ¶ 11.

[6] Pet. Ex. A ("2019 Charter").

[7] 2019 Charter § 4.1 (emphases omitted). Section 4.1 of the Company's initial certificate of incorporation was identical to Section 4.1 of the 2019 Charter. *Compare* DiamondPeak Hldgs. Corp., Registration Statement (Form S-1) (Jan. 18, 2019) Ex. 3.1 § 4.1 *with* 2019 Charter § 4.1.

[8] Pet. ¶ 3; *Lordstown Motors Corp. Class A Common Stock*, NASDAQ, https://www.nasdaq.com/market-activity/stocks/ride (last visited Feb. 21, 2023).

## B. The Charter Amendment

On August 1, 2020, the Company agreed to a business combination—a so-called de-SPAC transaction—with Lordstown EV Corporation ("Legacy Lordstown"), an electric vehicle automaker.[9] Upon closing, a wholly-owned subsidiary of the Company would merge with and into Legacy Lordstown, with Legacy Lordstown surviving as a wholly-owned subsidiary of the Company.[10] A special meeting for stockholders to vote on the merger was set for October 22, 2020.[11]

At the special meeting, stockholders would also be asked to vote on proposed amendments to the 2019 Charter. One proposed amendment would increase the number of authorized shares of Class A Common Stock from 100,000,000 to 300,000,000 (the "Charter Amendment").[12] The Charter Amendment was needed to "provide adequate authorized share capital" to facilitate the de-SPAC merger and

---

[9] Pet. Ex. B ("2020 Proxy") at 18.

[10] 2020 Proxy at 18.

[11] *Id*. at Cover Page; Pet. ¶ 2.

[12] Specifically, the proposed Charter Amendment would "increase the number of authorized shares of [the Company's] capital stock, par value $0.0001 per share, from 111,000,000 shares, consisting of (i) 110,000,000 shares of common stock, including 100,000,000 shares of Class A common stock and 10,000,000 shares of Class B common stock, and (ii) 1,000,000 shares of preferred stock, to 312,000,000 shares, consisting of (i) 300,000,000 shares of Class A common stock and (ii) 12,000,000 shares of preferred stock." 2020 Proxy at 1, 6, 69, 90, 126.

related transactions, such as a private investment in public equity (PIPE).[13]  The

Charter Amendment would also "provide flexibility for future issuances of capital

stock" determined by the Board of Directors to be in the Company's best interest.[14]

The Company solicited stockholder approval for the merger and the Charter

Amendment through an October 8, 2020 proxy statement.[15]  The proxy statement

explained that the Charter Amendment required the "affirmative vote . . . of the

holders of a majority of the outstanding shares of Class A [C]ommon [S]tock and

Class B [C]ommon [S]tock entitled to vote thereon at the special meeting, voting as

a single class."[16]

There were 35,000,000 shares of Common Stock outstanding and entitled to

vote at the special meeting, consisting of 28,000,000 shares of Class A Common

Stock and 7,000,000 shares of Class B Common Stock.[17]  A Form 8-K filed by the

Company after the special meeting disclosed that the Charter Amendment received

the affirmative vote of 18,292,011 shares of Common Stock.[18]  This tally included—

but did not distinguish between—shares of Class A Common Stock and Class B

---

[13] *Id.* at 126 (describing the purposes for the Charter Amendment).

[14] *Id.*

[15] Pet. ¶ 12.

[16] 2020 Proxy at Cover Page, 7, 86, 128.

[17] Pet. ¶ 14 (citing 2020 Proxy at 25).

[18] *Id.* (citing DiamondPeak Hldgs. Corp., Current Report (Form 8-K) (Oct. 22, 2020)).

Common Stock.[19]  Because a majority of the Common shares entitled to vote supported the Charter Amendment, the Company believed that the requisite vote had been obtained and that the Charter Amendment had been approved.[20]

### C.    The Share Issuances

On October 23, 2020, the Company filed its Second Amended and Restated Certificate of Incorporation (the "2020 Charter") with the Delaware Secretary of State.[21]  The same day, the Company closed its merger with Legacy Lordstown and changed its name to Lordstown Motors Corporation.[22]

The Company issued an aggregate of 86,949,893 shares of Class A Common Stock in connection with the merger and the conversion of other outstanding securities into Class A Common Stock.[23]  Just before closing, the Company also issued 50,000,000 shares of Class A Common Stock in a PIPE financing transaction.[24]  Overall, as a result of the merger and related transactions, the number

---

[19] DiamondPeak Hldgs. Corp., Current Report (Form 8-K) (Oct. 22, 2020).

[20] Pet. ¶ 14.

[21] *Id*. ¶ 2; Pet. Ex. C ("2020 Charter") § 4.1.

[22] Pet. ¶ 3.

[23] *Id*.

[24] *Id*.

of outstanding shares of Class A Common Stock increased from 28,000,000 to 164,948,923.[25]

After closing, the Company issued another 50,171,320 shares before amending the 2020 Charter in August 2022 to further increase the number of authorized shares of Class A Common Stock.[26] In total, the Company issued 115,120,243 shares of Class A Common Stock beyond that authorized by the 2019 Charter.[27]

### D. The Stockholder Demand

In March 2022—eighteen months after the 2020 Charter became effective— the Company received a demand letter from three purported Company stockholders (the "Demand Letter").[28] The Demand Letter challenged whether the correct voting standard had been applied to the stockholder vote on the Charter Amendment under the terms of the 2019 Charter and 8 *Del. C.* § 242(b)(2).[29] The Demand Letter

---

[25] *Id.*

[26] This amendment increased the number of authorized Class A Common shares from 300,000,000 to 450,000,000. *Id.*; Lordstown Motors Corp., Current Report (Form 8-K) (Aug. 17, 2022).

[27] Pet. ¶ 3.

[28] *Id.* ¶ 4; Pet. Ex. D ("Demand Ltr.").

[29] Section 242(b)(2) provides that "[t]he holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class." 8 *Del. C.* § 242(b)(2). A company may opt out of the separate class vote requirement by adopting an opt-out provision in its certificate of incorporation. *Id.* (stating that an opt-out provision could be

asserted that the Class A Common Stock was a separate class of stock and that the Charter Amendment required the approval of holders of a majority of the outstanding shares of Class A Common Stock voting as a separate class.[30] Because the Charter Amendment did not receive such approval, the stockholders maintained that the Charter Amendment was unauthorized.[31]

### E. The Legal Opinion

The Company sought the advice of several law firms, including Delaware counsel, regarding the assertions in the Demand Letter.[32] An April 1, 2022 opinion of Delaware counsel (the "Legal Opinion") concluded that "a separate class vote of the Class A Common Stock was not required under either the [2019 Charter] or the DGCL to approve the [Charter Amendment]" because "[t]he Class A Common

---

"provided in the original certificate of incorporation, in any amendment thereto which created such class or classes of stock or which was adopted prior to the issuance of any shares of such class or classes of stock, or in any amendment thereto which was authorized by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock"). The Company did not have an opt-out provision in its 2019 Charter. *See* 2019 Charter; Demand Ltr. at 5.

[30] Demand Ltr. at 5.

[31] *Id*. at 5-6. The Demand Letter stated that a total of 28,000,000 shares of Class A Common Stock were entitled to vote on the Charter Amendment but deduced that only 11,292,011 Class A Common shares voted in favor. *Id*.; Pet. ¶ 2. According to the Demand Letter, all 7,000,000 shares of Class B Common Stock voted in favor of the Charter Amendment. Pet. ¶ 14 (citing Demand Ltr. at 6); *In re Lordstown Motors Corp.*, C.A. No. 2023-0083-LWW, at 38-39 (Del. Ch. Feb. 20, 2023) (TRANSCRIPT).

[32] Pet. ¶ 5; *see e.g.*, Pet. Ex. E ("Legal Op.").

9

Stock [was] a series of the Common Stock, and not a separate class of capital stock of the Company."[33]  The Legal Opinion provided several bases for that conclusion:

- The DGCL allows for the division of the total authorized capital stock into one or more classes of stock, which classes may be further divided into series.[34]

- The 2019 Charter provided that the Company was authorized to issue "110,000,000 shares of [Common Stock], including (i) 100,000,000 shares of Class A Common Stock . . . and (i) 10,000,000 shares of Class B Common Stock."[35]  The use of the word "including" and the fact that the shares of Class A Common Stock and Class B Common Stock sum to the total shares of Common Stock indicated, in counsel's view, that "Class A Common Stock and Class B Common Stock are two subtypes that together comprise the broader category of Common Stock."[36]

- The 2019 Charter referred to "series of Common Stock" and "series of Preferred Stock," which counsel interpreted to indicate that the Company had two classes of stock—"Common" and "Preferred."[37]

- The Delaware Division of Corporations' records indicated that it interpreted the language in Section 4.1 of the 2019 Charter as creating two authorized "stock classes" of capital stock denoted "Common" and "Preferred."[38]

---

[33] Legal Op. at 3, 5.

[34] *Id.* at 3-4 & nn.3-6 (citing 8 *Del. C.* §§ 102(a)(4), 102(b)(3), 141(c), 151(a), 151(c), 151(e)-(g); 204(d)(1)-(2), 214, 223, 242(a)-(b), 251(d), 251(h)(2)-(3); *Siegman v. Palomar Med. Techs., Inc.*, 1998 WL 118201, at *4 (Del. Ch. Mar. 9, 1998) (recognizing that "the [DGCL] regards 'classes' of stock as separate and distinct from 'series' within a class")).

[35] 2019 Charter § 4.1.

[36] Legal Op. at 4.

[37] *Id.*; *see e.g.*, 2019 Charter §§ 4.2, 4.3(iii), 4.3(c), 4.3(d).

[38] Legal Op. at 4.

On April 1, 2022, the Company filed a Form 8-K explaining that its Board of Directors had reviewed the assertions in the Demand Letter and determined, in reliance on the advice of several law firms and the Legal Opinion, that the Demand Letter was wrong.[39] That is, the Board concluded that "a separate class vote of the Class A [C]ommon [S]tock was not required to approve the [Charter Amendment]" to increase the shares of Class A Common Stock.[40]

### F.    The *Boxed* Decision

The Company was not alone in receiving a stockholder demand regarding the voting standard required to approve a share increase charter amendment. Some SPACs—like Lordstown—resisted these stockholder demands because they interpreted their charters as designating two series of common stock that were part of a single class. Others responded by supplementing their proxy materials to obtain

---

[39] Pet. ¶ 5; Lordstown Motors Corp., Current Report (Form 8-K) (Apr. 1, 2022) ("Apr. 1, 2022 Form 8-K").

[40] Apr. 1, 2022 Form 8-K.

11

a separate class vote to effect an authorized share increase.[41]  Petitions seeking fee awards for causing the separate class vote followed.[42]

On December 27, 2022, the Court of Chancery issued a memorandum opinion in *Garfield v. Boxed, Inc.* addressing one such fee petition.[43]  There, the plaintiff's counsel (the same who sent the Demand Letter to the Company) had demanded that a SPAC count the votes of Class A common stockholders separately from Class B common stockholders in voting on a charter amendment to increase the number of authorized Class A common shares.[44]  The defendant company responded by providing Class A common stockholders with a separate class vote on the proposed

---

[41] *See, e.g.*, Order, *Delman v. Fusion Acq. Corp.*, C.A. No. 2021-0752-JRS (Del. Ch. Sept. 10, 2021) (Dkt. 9); Order, *Bass v. Mudrick Cap. Acq. Co.*, C.A. No. 2021-0690-LWW (Del. Ch. Aug. 16, 2021) (Dkt. 12).  In these cases, a plaintiff stockholder had filed an action challenging the charter amendment.  After the SPAC supplemented its proxy materials, the parties voluntarily dismissed the action as moot, and the court retained jurisdiction to determine plaintiff's counsel's application for an award of attorneys' fees and expenses. The plaintiff's counsel has not yet applied for such fees and expenses.

[42] *See, e.g.*, Pl.'s Opening Br. in Supp. of Appl. for Fees and Expenses, *Franchi v. dMY Tech. Grp., Inc. IV*, C.A. No. 2021-0841-KSJM (Del. Ch. Oct. 20, 2022) (Dkt. 7); Pl.'s Opening Br. in Supp. of Appl. for Fees and Expenses, *Franchi v. CM Life Scis. III Inc.*, C.A. No. 2021-0842-KSJM (Del. Ch. Oct. 20, 2022) (Dkt. 10); Verified Compl., *Drulias v. Pardes Biosciences, Inc.*, C.A. No. 2022-0432-LWW (Del. Ch. May 18, 2022) (Dkt. 1); Pl.'s Appl. for an Award of Att'ys' Fees, *Umbright v. Khosla Ventures Acq. Co. II*, C.A. No. 2021-0762-LWW (Del. Ch. Mar. 14, 2022) (Dkt. 18); Verified Compl. Seeking Award of Att'ys' Fees and Expenses, *Elstein v. Hagerty, Inc.*, C.A. No. 2022-0214-LWW (Del. Ch. Mar. 7, 2022) (Dkt. 1); Verified Compl. Seeking Award of Att'ys' Fees and Expenses, *Solak v. Redbox Ent., Inc.*, C.A. No. 2022-0099-LWW (Del. Ch. Jan. 28, 2022) (Dkt. 1).

[43] 2022 WL 17959766.

[44] *Id.* at *3.

amendment.[45] The plaintiff's counsel subsequently demanded a fee award from the company.[46]

In assessing whether the plaintiff had conferred a corporate benefit meriting a fee award, the court reviewed the plaintiff's assertion that the share increase amendment "would have violated Section 242(b)(2) if voted on by the Class A and Class B stockholders together."[47] This analysis "hinge[d] on" whether the company's original certificate of incorporation "authorized Class A and Class B as two classes of common stock, or as series within a single class."[48] The court interpreted the plain meaning of the relevant charter provision to provide that Class A and Class B common shares were "classes" rather than "series" of stock.[49]

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at *6.

[49] *Id.* (explaining that "Delaware courts interpret contract terms [such as a company's certificate of incorporation] according to their plain, ordinary meaning" and that the relevant charter provision "use[d] only the word 'class' not the word 'series,' to describe the authorized common shares").

The court also noted that 8 *Del. C.* § 102(a)(4) prescribes that a corporation's certificate of incorporation set forth the number of shares of all classes and of each class and whether the shares are par or no-par. No such preemptive recitation is required for series. *Id.* at *8. Because the certificate of incorporation listed the number of shares of Class A common stock, the number of shares of Class B common stock, and the number of shares of preferred stock, and set forth the par value of the shares for each, the court read the certificate as authorizing three classes of stock in compliance with Section 102(a)(4). *Id.* at *9. Further, the section of the charter addressing preferred stock vested the board with the authority to provide for "one or more series of Preferred Stock" and to establish "the number of shares to be included in each such series" by resolution, complying with

13

Thus, the court concluded that the amendment to increase the number of authorized Class A common shares "required a separate Class A vote" under Section 242(b)(2).[50] The court awarded fees to the plaintiff's counsel since the actions taken as a result of the demand letter "prevented a cloud from hanging over the Company's capital structure."[51]

## G. Subsequent Developments

The charter provision at issue in *Boxed* is substantially identical to Section 4.1 of the Company's 2019 Charter.[52] Under *Boxed*, the 2019 Charter could be read to have designated Class A Common Stock and Class B Common Stock as two classes of Common Stock. In that case, the Charter Amendment would have required the approval of the holders of Class A Common Stock voting as a separate class. Such approval was not obtained. The *Boxed* decision therefore cast doubts on the validity of the Charter Amendment and the shares of Class A Common Stock issued, or to be issued, in reliance on the Charter Amendment.[53]

---

Section 102(a)(4)'s prescription for granting a board authority to fix by resolution the number and terms of series of stock. *Id.* By contrast, the charter did not include a similar provision granting the board authority to fix series of common stock. *Id.*

[50] *Id.*

[51] *Id.* at *11.

[52] *Compare* 2019 Charter §§ 4.1 & 4.2 *with Boxed*, 2022 WL 17959766, at *7.

[53] Pet. ¶¶ 7-9.

This conundrum is not unique to Lordstown. A significant number of SPACs had certificate of incorporation provisions that—like that addressed in *Boxed*—referred to the shares of common stock existing at the time as "Class A" and "Class B." It has been customary for SPACs to present charter amendments to increase the number of authorized shares of Class A common stock for approval by a majority of the Class A and Class B common stockholders voting as a single class. Consequently, these post-de-SPAC companies are experiencing uncertainty over their capital structures and the validity of their stock.

### H. The Petition

On January 26, 2023, the Company filed a Verified Petition for Relief Pursuant to 8 *Del. C.* § 205. The Petition asks the court to validate and declare effective the Charter Amendment and the 115,120,243 shares of Class A Common Stock issued in reliance on the effectiveness of that amendment.[54]

The Company also filed a motion for expedited proceedings, which I granted in a February 3 letter decision and order (the "Letter Order").[55] The Letter Order required the Company to provide notice to stockholders of a hearing on the Petition.[56] On February 8, in accordance with the Letter Order, the Company filed

---

[54] *Id.* at Prayer for Relief.

[55] Dkt. 3 ("Ltr. Order").

[56] *Id.* at 1-2.

a Form 8-K that attached the Petition, described the relief sought in the Petition, informed stockholders of the time, date, and location of the hearing on the Petition, and explained how stockholders could appear and be heard at or in advance of the hearing.[57] A hearing on the Petition was held on February 20.[58] No stockholders filed objections to the Petition or appeared at the hearing to object.[59]

Although Lordstown was the first company to seek validation after *Boxed*, it is far from the last.[60] I heard five similar Section 205 petitions—in addition to the Company's Petition—on February 20 and others are scheduled to be heard in the coming weeks. The legal analysis that follows is addressed to the specific relief requested by Lordstown, but my reasoning should prove instructive to other companies seeking the court's assistance to validate similar corporate acts.[61]

---

[57] Dkt. 7; *see* Ltr. Order at 2.

[58] *See* Dkt. 12.

[59] On February 3, 2023, Lordstown stockholders pursuing class action breach of fiduciary duty claims in a separate action (*In re Lordstown Motors Corp. Stockholder Litigation*, Consol. C.A. No. 2021-1066-LWW (Del. Ch.)) filed a letter in this action requesting an opportunity to take expedited discovery and to appear as interested parties. Dkt. 6. On February 13, I issued a letter opinion in this action explaining that the stockholders were "welcome to appear and be heard at the hearing [on the Petition]," but I declined to order expedited discovery. *In re Lordstown Motors Corp.*, C.A. No. 2023-0083-LWW, at 2, 5 (Del. Ch. Feb. 13, 2023). Those stockholders did not file objections or appear at the hearing.

[60] At the time of this decision, 36 similar petitions pursuant to Section 205 have been filed in this court.

[61] Specific reasoning applicable to each petition will be addressed in bench rulings or orders in the relevant Section 205 proceeding, as appropriate.

## II. LEGAL ANALYSIS

The Company asks the court to exercise its authority under 8 *Del. C.* § 205 to validate a potentially defective corporate act.[62]  Enacted on June 30, 2013 and effective April 1, 2014, Sections 204 and 205 "established two statutory methods that parties can use to fix defective corporate acts that otherwise might be void."[63] "Section 204 is 'a self-help provision that allows the board of directors, by following specified procedures, to validate a defective corporate act.'"[64]  "Section 205 is a judicial mechanism under which identified parties can 'petition the Delaware Court of Chancery to enter an order validating or invalidating, as the case may be, the defective act'" if self-help is unavailable or subject to challenge.[65]

---

[62] Pet. ¶ 10; *see* 8 *Del. C.* § 204(a) (stating that "no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in this section or validated by the Court of Chancery in a proceeding brought under § 205 of this title").

[63] *Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 435 (Del. Ch. 2020); *see* 8 *Del. C.* §§ 204, 205.

[64] *Applied Energetics*, 239 A.3d at 435 (quoting C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 402 (2014) [hereinafter *Restoring Equity*]).

[65] *Id.* (quoting *Restoring Equity*, *supra* note 64, at 402).

## A.      Applicability of Section 205(a)

Under 8 *Del. C.* § 205(a), this court may determine "the validity of any corporate act or transaction and any stock" and the validity and effectiveness of any defective corporate act.[66] The term "defective corporate act" is defined to include:

> any act or transaction purportedly taken by or on behalf of the corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under [8 *Del. C.* §§ 121-27] (without regard to the failure of authorization identified in [8 *Del. C.*] § 204(b)(1)(D) . . .), but is void or voidable due to a failure of authorization.[67]

A "failure of authorization" includes:

> (i) the failure to authorize or effect an act or transaction in compliance with (A) the provisions of [the DGCL], [or] (B) the certificate of incorporation or bylaws of the corporation, or (C) any plan or agreement to which the corporation is a party or the disclosure set forth in any proxy or consent solicitation statement, if and to the extent such failure would render such act or transaction void or voidable.[68]

The historical corporate acts at issue in the Petition are the sort that Section 205 was designed to address.[69] If the Company's Class A Common Stock were a

---

[66] 8 *Del. C.* § 205(a)(4); *see generally id.* § 205(a).

[67] *Id.* § 204(h)(1).

[68] *Id.* § 204(h)(2).

[69] *See In re Mullen Auto., Inc. S'holder Litig.*, C.A. No. 2022-1131-LWW, at 43 (Del. Ch. Jan. 23, 2023) (TRANSCRIPT) (observing that the "filing and effectiveness" of a charter amendment and the "validity of [s]ecurities issued in reliance on the [a]mendment's validity" fell within Section 205(a)(4)); *see also Restoring Equity*, *supra* note 64, at 422-23

separate class of capital stock, Section 242(b)(2) would have required a separate class vote of the Class A Common Stock. Arguably, a sufficient number of shares of a class could vote to approve such a charter amendment irrespective of the disclosed single class voting structure, authorizing the amendment as a practical matter.[70] In the Company's case, however, the requisite approval of a majority of the Class A Common shares was not obtained.[71] If the Charter Amendment did not validly increase the number of shares of Class A Common Stock authorized for issuance, then the Company overissued shares.[72]

Regardless of whether these acts are technically void or voidable due to a failure of authorization, the Company has encountered sudden and pervasive uncertainty as to its capitalization. Section 205 provides the court "with a

---

(noting that the failure to obtain a vote of a majority of common stock, voting as a separate class, on a charter amendment would constitute a "failure of authorization").

[70] For example, the petitioner in one matter sought to validate its amended charter and stock issued in reliance thereon using Section 205—even though the charter amendment proposal had secured the support of a majority of the Class A Common shares. Verified Pet. for Relief ¶ 16, *In re EVgo Inc.*, C.A. No. 2023-0132-LWW (Del. Ch. Feb. 3, 2023) (Dkt. 1). The petitioner asserted that the vote's validity could nonetheless be challenged "because it was not structured and disclosed upfront as a class-by-class vote as *Boxed* appears to require." *Id.* ¶ 27 (quoting *Boxed*, 2022 WL 17959766, at *10-11). But—despite the vote—questions from auditors and others about the soundness of the petitioner's capital structure post-*Boxed* threatened dire consequences. Section 205 provides the most effective and efficient path to certainty in the unique circumstances confronting the petitioner (and others like it). *See In re EVgo Inc.*, C.A. No. 2023-0132-LWW, at 13-15 (Del. Ch. Feb. 20, 2023) (TRANSCRIPT).

[71] *See supra* note at 31.

[72] Pet. ¶ 3.

19

mechanism to eliminate equitably any uncertainty" where questions of validity persist.[73] The statute confers "substantial discretion on the court and, absent obvious procedural requirements, does not set a rigid outer boundary on the Court's power."[74] The Delaware General Assembly intended Section 205 to provide an "adaptable, practical framework" for correcting blemished corporate acts "without disproportionately disruptive consequences."[75]

I therefore go on to consider whether the court should exercise its authority under Section 205 to validate and declare effective the Charter Amendment and the shares issued in reliance on the effectiveness of the Charter Amendment.

---

[73] *In re Genelux Corp.*, 126 A.3d 644, 666-67 (Del. Ch. Oct. 2015) *vacated in part sub nom.*, *Genelux Corp. v. Roeder*, 143 A.3d 20 (Del. 2016); *see also* 8 *Del. C.* §§ 205(a)(4) (allowing the court to "[d]etermine the validity of any corporate act"), 205(d)(5) (allowing the court to consider "[a]ny other factors or considerations the [it] deems just and equitable"); *In re Baxter Int'l Inc.*, C.A. No. 11609-CB, at 21 (Del. Ch. June 22, 2016) (TRANSCRIPT) (validating a charter amendment despite the petitioner's belief in its validity where "[l]itigable questions" and "a history of uncertainty" surrounded the validity of the original charter provision); *Mullen*, C.A. No. 2022-1131-LWW, at 40, 45 (granting relief pursuant to Section 205 where the company believed that a charter amendment was validly approved by stockholders, in part because there was "a cloud of uncertainty" about the results of the vote and the company's capitalization); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 6.33 (4th ed. 2023-1 Supp.).

[74] *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *7 (Del. Ch. Jan. 30, 2015), *aff'd sub nom. In re Numoda Corp.*, 2015 WL 6437252 (Del. 2015) (TABLE).

[75] *Id.* at *8 (citing *Restoring Equity*, *supra* note 64, at 393-94, 399-401); *see also In re Numoda Corp.*, 2015 WL 6437252, at *3.

## B.    Section 205(d) Analysis

Section 205(d) sets out five factors that the court "may consider" when determining whether to validate a corporate act:

> (1) Whether the defective corporate act was originally approved or effectuated with the belief that the approval or effectuation was in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation;
>
> (2) Whether the corporation and board of directors has treated the defective corporate act as a valid act or transaction and whether any person has acted in reliance on the public record that such defective corporate act was valid;
>
> (3) Whether any person will be or was harmed by the ratification or validation of the defective corporate act, excluding any harm that would have resulted if the defective corporate act had been valid when approved or effectuated;
>
> (4) Whether any person will be harmed by the failure to ratify or validate the defective corporate act; and
>
> (5) Any other factors or considerations the Court deems just and equitable.[76]

The list is neither exclusive nor mandatory but meant to guide the court's exercise of its discretion.[77]

Each factor supports granting the relief sought in the Petition.

---

[76] 8 *Del. C.* § 205(d).

[77] *See Genelux*, 126 A.3d at 666 (describing the factors as "non-exclusive [and] non-mandatory"); *Mullen*, C.A. No. 2022-1131-LWW, at 43 (noting that the Section 205(d) factors are "meant to guide the trial court").

### 1. Good Faith Belief in Validity

First, I have no reason to doubt that the Company and Board approved and effectuated the Charter Amendment with the good faith belief that the amendment complied with Delaware law and the 2019 Charter.[78] Upon receiving the Demand Letter, the Board undertook a review of the matters raised with the assistance of outside counsel uninvolved in the transactions in question.[79] The Board, relying on that advice—including the Legal Opinion—determined that a separate class vote of the Class A Common Stock was not required to approve the Charter Amendment.[80] No litigation against the Company has questioned the validity of the Charter Amendment.[81] It was not until the *Boxed* decision that the Company perceived a risk that the Charter Amendment could be viewed as potentially defective.[82]

### 2. Treatment of the Act as Valid

Second, the record demonstrates that the Company and Board have consistently treated these corporate acts as valid and effective.[83] Since effectuating the Charter Amendment, the Company has issued 115,120,243 shares in excess of

---

[78] Pet. ¶ 19; *see Mullen*, C.A. No. 2022-1131-LWW, at 43-44.

[79] Pet. ¶ 19; Apr. 1, 2022 Form 8-K.

[80] Pet. ¶ 19; Apr. 1, 2022 Form 8-K.

[81] Pet. ¶ 19.

[82] *Id.*

[83] *Id.* ¶ 15; *see Mullen*, C.A. No. 2022-1131-LWW, at 45.

the 100,000,000 shares authorized under the 2019 Charter.[84]  The Company has disclosed theses issuances in various public filings.[85]  For example, a July 7, 2022 proxy statement disclosed that the Company had issued 205,871,561 shares of Class A Common Stock and had reserved over 43,000,000 shares for further issuance.[86] And an August 18, 2022 Form 8-K announced that stockholders had approved an amendment to the Company's 2020 Charter to increase the number of authorized shares of Class A Common Stock from 300,000,000 to 450,000,000.[87]

Third parties have also acted in reliance on the validity of the Charter Amendment since it was adopted more than two years ago.  The participants in the de-SPAC merger and related transactions, such as the PIPE, relied upon the terms of the 2020 Charter because it set forth the terms of the securities they received as a result of the business combination.[88]  The Company's employees and directors, who have been compensated with equity grants issued under the 2020 Charter, assumed

---

[84] Pet. ¶ 15.

[85] *Id.*

[86] Lordstown Motors Corp., Proxy Statement (Schedule 14A Information) (July 7, 2022) ("2022 Proxy"); Pet. ¶ 15.  This proxy statement solicited stockholder approval for an amendment to increase the number of authorized shares of Class A Common Stock from 300,000,000 to 450,000,000.  2022 Proxy at 4.

[87] This amendment was approved by a majority of the issued and outstanding shares of Class A Common Stock at an August 17, 2022 special meeting.  At the time, there were no outstanding shares of Class B Common stock.  Lordstown Motors Corp., Current Report (Form 8-K) (Aug. 18, 2022); Pet. ¶ 15.

[88] Pet. ¶ 3.

that their grants would be honored.[89]  Purchasers of Class A Common Stock or other securities convertible or exercisable for Class A Common Stock did so with the expectation that they would receive the securities they bargained and paid for.

### 3. Harm From Validation

Third, I cannot conceive of any legitimate harm that would result from validating the Charter Amendment.[90]  Other than the stockholders who sent the Demand Letter, Company stockholders and market participants appear to have expected that the 2020 Charter—and stock issued in reliance thereon—was valid.[91]  Validation would give effect to the de-SPAC merger on the terms understood and accepted by its participants in 2020.  It would also restore settled expectations of the Company and its stockholders with respect to the Company's certificate of incorporation and capitalization.  It is unsurprising, then, that no stockholder objected to the Petition.

---

[89] *Id.* ¶ 18; 2022 Proxy at 5 (discussing the Company's equity incentive plan).

[90] Pet. ¶ 29.  *Boxed* highlighted the importance of achieving statutory compliance and vindicating the stockholder franchise.  2022 WL 17959766, at *10-11.  That is not to say, however, that validation will itself impair such important interests.  *See Mullen*, C.A. No. 2022-1131-LWW, at 44 (describing this factor as "neutral" where the "actions" leading to the potential invalidity arguably impaired the stockholder franchise).

[91] It bears noting that the counsel who sent the Demand Letter on behalf of purported Lordstown stockholders (and pursued a fee petition in *Boxed*) has sought substantial fees for making similar demands against other companies.  *See supra* notes 41-42 and accompanying text; *Almond ex rel. Almond Fam. 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at *21 (Del. Ch. Aug. 17, 2018), *aff'd*, 224 A.3d 200 (Del. 2019) (TABLE).

### 4. Harm Without Validation

Fourth, absent validation, a number of parties would face widespread harm.[92] The potential invalidity of shares of Common Stock issued, or to be issued, in reliance on the Charter Amendment casts doubt on the Company's capital structure.[93] This uncertainty could cause market disruption, impair the Company's commercial relationships, chill strategic opportunities, and jeopardize employee relationships.

Without validation, past and future results of stockholder votes would be called into question.[94] For example, the Company would not know how many shares it has outstanding and able to vote at its upcoming annual meeting.[95] The Company may not be able to issue public filings, especially if its auditors raise concerns about the effect of uncertainties on the Company's financial statements. The Company could also risk delisting from the NASDAQ.[96]

If the Petition is denied, the Company may be unable to obtain the substantial capital needed to achieve production targets, develop additional vehicles, and

---

[92] Pet. ¶¶ 16-18; *see Mullen*, C.A. No. 2022-1131-LWW, at 45.

[93] Pet. ¶ 17.

[94] *Id.*

[95] *Id.*

[96] *Id.*

continue operations.[97]  The Company has equity financing transactions pending with a key business partner and, as a condition to closing, will need to certify the number of shares outstanding and authorized for issuance—not to mention the validity of the shares to be sold in the financings.[98]  The Company also recently entered into an at-the-market financing arrangement, which closing is subject to the accuracy of the Company's representations on its capitalization.  Without these financing transactions, the Company's liquidity position, operations, and future prospects will suffer.[99]

### 5.    Other Factors

Additional considerations indicate that validation would be "just and equitable."[100]  Relief under Section 205 is the most efficient and conclusive—and perhaps the only—recourse available to the Company.  Validation is consistent with Section 205's purpose to provide a means to remedy "defective corporate acts that would otherwise be considered incurable."[101]

---

[97] *Id.* ¶ 18.

[98] *Id.*

[99] *Id.*

[100] *See* 8 *Del. C.* § 205(d)(5).

[101] *See Cirillo Fam. Tr. v. Moezinia*, 2018 WL 3388398, at *8-9 (Del. Ch. July 11, 2018) (explaining that the purpose of Section 205 "fundamentally concerns a company having taken an act with the intent and belief that it is valid and later petitioning the Court to correct a technical defect and thereby remedy incidental harm"), *aff'd*, 220 A.3d 912 (Del. 2019) (TABLE).

Ratification of the Charter Amendment under Section 204 is not a practicable alternative because it is not clear which stockholders would be entitled to vote on a ratification proposal. In the years since the vote on the Charter Amendment, the Company's Class A Common Stock has been actively traded on the NASDAQ. The Company lacks a practical way to effectively trace the shares that were issued before the Charter Amendment became effective. Even the 100,000,000 shares of Class A Common Stock authorized under the 2019 Charter could not be fully identified because many were issued simultaneously with shares issued pursuant to the Charter Amendment.[102]

*       *       *

For these reasons, I conclude that the corporate acts at issue should be validated pursuant to Section 205(a)(4).[103] The Company filed and effected the Charter Amendment with the good faith belief that it was adopted in compliance with Delaware law and the 2019 Charter. The Company and third parties— including market participants, financing sources, business partners, stockholders, employees, and directors—have treated the Charter Amendment as valid and acted

---

[102] Pet. ¶ 20.

[103] Section 205(a)(3) also appears applicable. *See* 8 *Del. C.* § 205(a)(3) (stating that the court may "[d]etermine the validity and effectiveness of any defective corporate act not ratified or not ratified effectively pursuant to § 204"); *Applied Energetics*, 239 A.3d 409 at 436 & n.15 (discussing how a corporate action could fall within both Sections 205(a)(3) and 205(a)(4)).

in reliance on the Charter Amendment's validity. The Company issued 115,120,243 shares of Class A Common Stock in reliance on the effectiveness of the Charter Amendment and has described those shares as issued and outstanding in its SEC filings, financial statements, and third-party agreements. Although it is not apparent that any persons would be harmed by validating the Charter Amendment, the Company, its stockholders, and other parties face substantial damage absent relief.

## III. CONCLUSION

The relief sought in the Petition is granted. The Charter Amendment, including the filing and effectiveness thereof, is hereby validated and declared effective pursuant to 8 *Del. C.* § 205. The 115,120,243 shares of Class A Common Stock issued in reliance on the effectiveness of the Charter Amendment are hereby validated and declared effective pursuant to 8 *Del. C.* § 205. IT IS SO ORDERED.